United States District Court
Southern District of Texas
FILED

SEP 1 1 2020

David J. Bradley, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
MCALLEN DIVISION

MELISSA KASHANCHI,                    §
                                      §
        Plaintiff,                    §
                                      §
VS.                                   §        CIVIL ACTION NO. 7:19-CV-310
                                      §
ANDREW SAUL,                          §
                                      §
        Defendant.                    §

## REPORT AND RECOMMENDATION

Plaintiff Melissa Kashanchi, proceeding with retained counsel, filed this action pursuant to

42 U.S.C. § 405(g), seeking review of the Commissioner of Social Security's denial of disability

benefits. Plaintiff's application alleged that she became disabled in October 2014 due to the

deterioration of her left knee, thyroid cancer, depression, rheumatoid arthritis, anemia, and

Hashimoto's thyroiditis. An Administrative Law Judge (ALJ) found that, while Plaintiff's

physical conditions limited her to a restricted range of sedentary work, she is still capable of

performing several different jobs that exist in significant numbers, and thus she is not disabled.

In challenging the Commissioner's denial of benefits, Plaintiff alleges that the

Administrative Law Judge (ALJ) erred in the following ways: 1) failing to properly consider all of

Plaintiff's vocationally significant impairments at Step Two of the disability analysis; 2) failing to

find Plaintiff met the requirements for a presumptive disability at Step Three; 3) rejecting the

medical opinions of the State Agency physicians and substituting her own lay medical findings

regarding Plaintiff's residual functional capacity (RFC); and 4) finding that Plaintiff's subjective

complaints were not fully supported by the medical evidence. (Docket No. 7.) Pending before the

Court are the parties' cross motions for summary judgment. (Docket Nos. 7, 10.)

A federal court may review the Commissioner's denial of benefits only to determine whether it is supported by substantial evidence and whether the proper legal standards were applied; a court may not re-weigh the evidence or substitute its judgment for the Commissioner's. *Masterson v. Barnhart*, 309 F.3d 267, 272 (5th Cir. 2002).   After carefully considering the record in light of the deferential standard of review that applies, the undersigned concludes that Plaintiff's claims lack merit.

The record shows that the ALJ considered all of Plaintiff's alleged impairments and properly applied the requirements for the relevant listed impairments that are presumptively disabling; as such, the ALJ did not commit reversible error at Step Two or Step Three of the disability analysis.   In addition, the ALJ's careful and thorough written opinion shows that she properly considered the medical opinions of the state agency physicians, as well as Plaintiff's subjective complaints regarding the limiting effects of her various impairments.   The record supports the ALJ's findings.   Accordingly, for the reasons discussed further below, it is recommended that Plaintiff's summary judgment motion be denied, that the Commissioner's motion be granted, that the Commissioner's decision be affirmed, and that this action be dismissed.

## I. BACKGROUND

In January 2016, Plaintiff applied for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) under sections 216(i) and 223 of Title II of the Social Security Act, 42 U.S.C. §§ 401 et seq., and section 1614(a)(3)(A) of Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-83f, respectively.   (*See* Tr. 256-269.)[1]   In both applications, Plaintiff alleged

---

[1] The Commissioner has filed a transcript of the record of the administrative proceedings (Docket No. 6), which will be cited as "Tr."   The specific page of the administrative transcript will be cited by reference to the page numbers in bold typeface located in the bottom right corner of the transcript pages.

that she became disabled on October 15, 2014, and she identified left knee problems, thyroid cancer, depression, rheumatoid arthritis, anemia, and Hashimoto's thyroiditis as the conditions that prevented her from working. (Tr. 256, 260, 307.) Plaintiff's applications were denied initially and on reconsideration. Plaintiff then requested a hearing before an ALJ, which was held on June 5, 2018. The ALJ issued a written decision on October 3, 2018, finding that Plaintiff was not disabled because she was able to perform a limited range of sedentary work that included jobs existing in significant numbers in the national economy. (Tr. 59-73.)

Plaintiff filed a request with the Social Security Administration's Appeals Council to review the ALJ's adverse decision. The Appeals Council denied review, rendering the ALJ's decision the Commissioner's final decision for purposes of judicial review. In considering Plaintiff's challenge to the ALJ's decision, the evidence in the record will be summarized.[2]

## A.      Education, Work Experience, and Activities

At the time of the administrative decision, Plaintiff was 31 years old. Plaintiff attended one year of college and obtained a certification in medical billing and coding. (Tr. 308.) Plaintiff's most recent employment included short stints working as a sales agent (March 2012 to May 2012), a customer service representative (September 2012 to February 2013), and as a receptionist (June 2013 to August 2014). (Tr. 101, 295, 309, 330.) In her employment as a sales agent Plaintiff sat the entire day and did not lift or carry any objects. (Tr. 334.) As a customer service representative, she sat six hours per day and likewise did not lift or carry any objects. (Tr. 332.) In her more recent employment as a receptionist, Plaintiff sat five hours each day and would walk and/or stand

---

[2]  The Court must "scrutinize" the record to determine whether the ALJ's decision is supported by substantial evidence. *Johnson v. Bowen*, 864 F.2d 340, 343 (5th Cir. 1988). The undersigned has thoroughly reviewed the medical records and other evidence, which will be summarized above.

approximately two hours. (Tr. 331.) She frequently lifted objects weighing 10 pounds or less and sometimes lifted objects weighing up to 20 pounds. (*Id.*)

When Plaintiff filed her disability application, she was living with her minor son and several "other relatives." (Tr. 261, 317.) In her application, Plaintiff states that her condition limits her ability to work by causing her "constant fatigue, frequent visits to the doctor, . . . stress, [and] limit[ations] in walking." (Tr. 317.) She also notes that her rheumatoid arthritis limits her "mobility with lifting or being apart of certain activities." (Tr. 324.) When she is in pain (which "comes and goes"), she struggles with bathing and dressing, and she has begun to develop stiffness in her hands and swelling to her feet. (*Id.*) Plaintiff states that her cancer causes depression and fatigue. (*Id.*)

Despite these limitations, Plaintiff is still quite active. She transports her son to and from school, walks her dog several times a day, does her own grocery shopping, and picks up her own medications from the pharmacy. (Tr. 318.) Plaintiff also prepares her own meals and does household chores such as "cleaning, laundry, ironing, organizing, [and] dusting." (Tr. 319.) Plaintiff is able to bathe herself when sitting. (Tr. 318.) Some of her hobbies include reading, walking her dog, spending time with family members, playing chess, and scrapbooking. (Tr. 321.) In addition, Plaintiff reported an active social life which included shopping, going to church, and volunteering at her son's school. (Tr. 321-22.)

Plaintiff claims that she is limited in her ability to lift, squat, stand, kneel, climb stairs, and in using her hands. (Tr. 322.) Her ability to bend, reach, walk, and sit are not significantly affected. (*Id.*) She is unable to lift objects weighing more than 50 pounds and is unable to walk for long periods of time. (*Id.*) Her arthritis also limits her movement "sometimes." (*Id.*) Plaintiff has a hand brace that she uses "off and on." (Tr. 323.)

4

**B.**     **The Medical Evidence**

Plaintiff's medical records date back to 2012, although Plaintiff did not file for disability benefits until January 2016, and she does not allege that she was unable to work prior to October 2014. This summary of the medical evidence will focus on those physical impairments that are relevant to Plaintiff's application for disability benefits and, more specifically, to those impairments that are most relevant to her alleged points of error.

On March 31, 2012, Plaintiff visited Monzer Yazji, M.D., who completed a "Medical Source Statement Concerning the Nature and Severity of an Individual's Physical Impairment," which is essentially a residual functional capacity (RFC) assessment. (Tr. 425-29.) Dr. Yazji indicated that Plaintiff had been using crutches to stand and walk, that she was "unable to be on her feet for long periods," and that she was incapable for performing work even at the sedentary or light exertional levels. (Tr. 425-27.)

On April 17, 2013, Plaintiff returned to Dr. Yazji's office for blood work and an evaluation. The blood panel showed some abnormal results. (Tr. 572-73.) Upon evaluation, Plaintiff's chief complaint was "joint pain," but she also mentioned experiencing fatigue and osteoarthritis. (Tr. 541.) At the time, Plaintiff was taking Naproxen as needed to treat her joint pain. (*Id.*) Dr. Yazji's assessment/diagnosis included osteoporosis, generalized osteoarthritis, and anemia. (Tr. 543.)

About two months later, on June 3, 2013, Plaintiff had a follow up with Dr. Yazji. (Tr. 538.) Although she continued to complain of anemia, joint pains, osteoarthritis, and rheumatoid arthritis, her chief complaint at the time was fatigue. (*Id.*) Her exam was otherwise unremarkable.

On February 3, 2014, Plaintiff was seen by Jorge E. Tijmes, M.D., for "evaluation and treatment of her left knee pain." (Tr. 565-68.) Plaintiff stated that her left knee pain began four months earlier when "she stood up and noticed a pop." (Tr. 565.) According to Plaintiff, there

was pain to her left knee "with ambulation [and] occasional popping and locking." (*Id.*) She had been using "crutches for aid in ambulation" and taking Tylenol to help with the pain. (*Id.*) Dr. Tijmes noted "a slow rise from sitting position" and a "slow guarded gait with a limp noted to the left." (Tr. 567.)

Dr. Tijmes examined Plaintiff's left knee, which revealed "swelling to the anterior lateral aspect" and some tenderness. (Tr. 568.) She showed no effusion to the left knee but did have a limited range of motion due to "pain and stiffness." (*Id.*) The examination of her upper extremities was normal. (*Id.*) An x-ray of her left knee showed "mild medial compartment narrowing," but "no fractures subluxations" or "osteophyte formation" were noted. (*Id.*) Dr. Tijmes prescribed physical therapy and Naproxen for anti-inflammation. (*Id.*)

Because Plaintiff reported her left knee pain had been getting "progressively worse" for eight months, an MRI examination was performed in April 2015. The MRI showed "severely advanced degenerative changes of the knee, with multiple intra-articular loose bodies" inside, as well as "complete collapse of the medial and lateral tibiofemoral compartment, with extrusion and maceration of the medial and lateral meniscus." (Tr. 480-81.) In addition, the MRI showed inflammatory arthritis and synovitis. (Tr. 481.)

On May 15, 2015, Plaintiff was seen by Jorge Zamora Quezada, M.D., and she complained of moderate musculoskeletal pain to multiple joints.[3] (Tr. 440.) She also reported weakness and

---

[3] On January 15, 2020, a jury in this Division found Dr. Zamora guilty on multiple counts of conspiracy to commit health care fraud and health care fraud; he is awaiting sentencing. (*See United States v. Jorge Zamora-Quezada*, Crim. No. 7:18-cr-855.) The superseding indictment alleged that over the course of about 18 years, Dr. Zamora (among other things) falsely diagnosed patients with rheumatoid arthritis and prescribed unnecessary treatment and medicines in order to generate revenue and enrich himself. (*See id.* at Docket No. 115.) There is no indication whether Plaintiff was affected by such practices, and it will be assumed for purposes of this report that she was not.

inflammation to her hands and wrists. (*Id.*)  Upon examination, Dr. Zamora found Plaintiff to have normal range of motion in her back/spine and neck.  (Tr. 442.)  Plaintiff had swelling in both wrists with "maximum tenderness," as well as swelling and moderate pain in both her knees.  (*Id.*)  Dr. Zamora diagnosed Plaintiff with rheumatoid arthritis and placed her on numerous medications.[4] (Tr. 443-44.)  Plaintiff returned to Dr. Zamora on June 16, 2015, and July 17, 2015, and reported similar symptoms as before.  (Tr. 430-39.)

Several weeks later, on July 27, 2015, Plaintiff visited Valley Internal Medicine Associates to "establish care" with a new provider.  (Tr. 463.)  She had stopped her "multiple treatment regimens," was not taking any medications, and was in no apparent acute distress.  (*Id.*)  Her exam showed mild swelling to her right wrist and a limited range of motion in her left knee with crepitus[5] but no swelling was present.  (Tr. 463-64.)  Her assessments included rheumatoid arthritis, Hashimoto's disease,[6] and joint pain.  (Tr. 464.)

Plaintiff returned to Valley Internal Medicine Associates for a follow-up on August 17, 2015, and she reported that "overall [she] feels better."  (Tr. 458.)  Her examination revealed a enlarged thyroid nodule and "mild hyperpigmentation" over the base of her neck.  (Tr. 460-61.) She returned two weeks later complaining of "pain and swelling to [her] left knee" and she requested fluid removal.  (Tr. 456.)  The exam showed swelling, tenderness, and effusion[7] in her

---

[4] The medications included the following: Ergocalciferol (thyroid), Folbee (vitamin deficiency), Lidoderm (pain), methyl salicylate (pain), phentermine (appetite suppressant), and sulfasalazine (ulcerative colitis).  (Tr. 444.)

[5] Crepitus is defined as "the grating of a joint, often in association with osteoarthritis." STEDMAN'S MEDICAL DICTIONARY 424 (27th ed. 2000).

[6] Hashimoto's disease is the "diffuse infiltration of the thyroid gland with lymphocytes, resulting in diffuse goiter." STEDMAN'S MEDICAL DICTIONARY 1834 (27th ed. 2000).

[7] Effusion is "[t]he escape of fluid from the blood vessels or lymphatics into the tissue or a cavity." STEDMAN'S MEDICAL DICTIONARY 570 (27th ed. 2000).

7

left knee.  (*Id.*)  Plaintiff continued to see Dr. Yazji (or one of his associates) in the Fall of 2015 with similar complaints.  (*See* Tr. 516-37.)

On October 7, 2015, Abdulrahman Albustamy, M.D., noted that Plaintiff had a thyroid lesion, enlarged thyroid, and thyroid mass that needed to be surgically removed.  (Tr. 526-28.) After a thyroid biopsy and evaluation by Doctors Hospital at Renaissance and Texas Oncology, thyroid cancer could not be ruled out and Plaintiff was referred to MD Anderson Cancer Center for further treatment.  (Tr. 482-87, 489-509, 544-49, 553-64.)  Plaintiff was evaluated at MD Anderson Cancer Center and her options were "observation, right thyroid lobectomy and total thyroidectomy."  (Tr. 584-85, 597-604.)  Plaintiff chose observation with a follow-up and repeat ultrasound in 4-6 months.  (Tr. 585, 597, 601.)  On June 30, 2016, Plaintiff returned to MD Anderson Cancer Center for her follow-up and repeat biopsy.  (Tr. 701-09.)

On January 29, 2016, Plaintiff was evaluated at The Counseling Center for depression, which she attributed to stress resulting from her thyroid cancer diagnosis and a divorce.  (Tr. 577.) The evaluation noted that her two most recent GAF[8] scores were 68 and 78, respectively.  (*Id.*) About two weeks later, Dr. Yazji performed a mental RFC assessment, finding Plaintiff to be essentially "normal."  (Tr. 579-81.)

---

[8] "GAF is a standard measurement of an individual's overall functioning level 'with respect only to psychological, social, and occupational functioning.'" *Boyd v. Apfel*, 239 F.3d 698, 700 n.2 (5th Cir. 2001) (quoting AMERICAN PSYCHIATRIC ASS'N DIAGNOSTIC AND STATISTICAL MANUAL at 32 (4th ed. 1994)).  A GAF score is a "subjective" assessment that may or may not be consistent with objective findings.  *Foster v. Astrue*, 277 F. App'x 462, 464 (5th Cir. 2008) (unpublished).  As a reference point, a GAF score of below 50 represents a "serious impairment in social, occupational, or school functioning" and may be manifested in symptoms such as suicidal ideation and severe obsessional rituals.  *Boyd*, 239 F.3d at 702.  A GAF score of 61-70 "indicates only mild symptoms or some difficulty in social or occupational functioning." *Ray v. Barnhart*, 163 F. App'x 308, 313 (5th Cir. 2006) (unpublished); *Sims v. Barnhart*, 309 F.3d 424, 427 n.5 (7th Cir. 2002).

After Plaintiff applied for disability coverage, Tracy Copp, Ph.D., performed a mental status examination on April 26, 2016. (Tr. 696-699.) Dr. Copp noted that Plaintiff "had a gait disturbance and used crutches due to arthritis." (Tr. 696.) Ultimately, Dr. Copp diagnosed Plaintiff with depression but her evaluation determined the following:

> [Plaintiff's] comprehension and ability to carry out instructions do not seem to be impaired. Her ability to interact effectively with peers does not seem to be affected at this time. Her executive cognitive capabilities do not seem to be diminished by her symptoms. Physically, her abilities are affected by her condition. [Plaintiff] is able to manage her affairs effectively and in her own best interest.

(Tr. 699.) During the exam, Plaintiff stated that she "is able to look after her personal care and grooming, with pain" and that "[s]he can perform limited household chores, and run limited errands."[9] (*Id.*)

On March 8, 2016, a state agency physician, Dr. Michal Douglas, reviewed Plaintiff's medical records and performed a residual functional capacity (RFC) assessment. (Tr. 116-17, 119-22.) Dr. Douglas determined that Plaintiff had the ability to do the following: lift and/or carry 10 pounds frequently and 20 pounds occasionally; sit for 6 hours out of an 8-hour workday; stand or walk for 6 hours out of an 8-hour workday; and that her ability to push or pull was limited by her lower left extremities. (Tr. 120.) He also found that Plaintiff had postural limitations such that she could only "occasionally" climb, kneel, crouch, and crawl, and that she had a "limited" ability to manipulate objects with her fingers. (Tr. 120-21.) Dr. Douglas concluded that Plaintiff's alleged subjective limitations were only partially supported by objective medical evidence. (Tr. 122.) On August 31, 2016, another state agency physician, Dr. Brian Harper, reviewed Plaintiff's

---

[9] In addition, Plaintiff mentioned to Dr. Copp that "MD Anderson confirmed that there were no cancer cells" in her thyroid. (Tr. 697.)

9

medical records.  (Tr. 150, 155-56.)  Dr. Harper agreed with the residual function capacity assessment by Dr. Douglas. (Tr. 153-54.)

Plaintiff returned to Dr. Yazji on three occasions in March 2016.[10] (Tr. 640-59.) Her chief complaints during these visits was "thyroid, back pain, knee pain" (Tr. 640), "swelling to left knee" (Tr. 647), and "thyroid lesion, goiter" (Tr. 657). Plaintiff described pain in her entire back, "midback pain [that] worsens when bending," and "back stiffness." (Tr. 640.) She also described experiencing left knee joint pain that worsens with weightbearing and bending, with left knee swelling and "intermittent locking." (*Id.*) The exam showed "abnormal movement" of the knees and tenderness. (Tr. 644.) Plaintiff described similar problems with her left knee at her next visit five days later. (Tr. 647, 650.) As to her back, the exam showed swelling, tenderness, and muscle spasms in multiple areas. (Tr. 643.) However, several days later, Plaintiff made no mention of any back pain or left knee discomfort. (Tr. 657-59.)

On March 10, 2016, Dr. Yazji referred Plaintiff to Edinburg Physical Medicine and Rehab for treatment of her "thoracic pain, lumbar pain, [and left] knee pain." (Tr. 837.) The goals of the referral for physical therapy were to decrease muscle tightness in her back, increase her range of "lumbar flexion," increase her strength in her core stabilizers and left leg muscles, improve her gait pattern, decrease her dependence on crutches, and educate her in a home exercise program. (Tr. 839, 841, 843, 846, 848.) Plaintiff attended at least six sessions of physical therapy. (Tr. 847-48.) After completing this treatment, Plaintiff reported a "significant improvement" in pain levels, muscular inflammation, strength, range of motion, and her ability to bear weight. (*Id.*)

On May 7, 2016, Plaintiff returned to Dr. Yazji complaining of left knee swelling and an upper respiratory infection. (Tr. 663.) The examination of her left knee showed similar ongoing

---

[10] The visits occurred on March 2, 7, and 11, 2016.

symptoms such as swelling, pain (in both knees), tenderness, abnormal knee motion, and instability. (Tr. 666.) Plaintiff returned twice in May 2016, complaining of "acute bronchitis" and an "acute upper respiratory infection." (Tr. 742-751.)

On May 13, 2016, a state agency medical expert, Mark Schade, Ph.D., reviewed Plaintiff's medical records and performed a mental RFC assessment. (Tr. 118-19.) Dr. Schade acknowledged Plaintiff's history of post-traumatic stress disorder (PTSD) and depression, but also noted that she had "no [past] treatment for any mental health impairment." (Tr. 118.) More importantly, Plaintiff was "given a fair prognosis." (*Id.*) Overall, Dr. Schade found that the medical evidence of record "does not reflect a degree of mental/emotional signs or symptoms that would wholly compromise [her] capacity for work related abilities." (*Id.*) As such, he determined Plaintiff's "mental impairment to be non-severe." (*Id.*) On September 1, 2016, another state agency medical expert, Susan Posey, Ph.D., reviewed Plaintiff's medical records. (Tr. 151-52.) Dr. Posey agreed with the mental RFC assessment by Dr. Schade. (Tr. 152.)

Plaintiff continued to seek treatment from Dr. Yazji in June and July of 2016.[11] She had five separate visits during this time, complaining of pain to her left knee and fatigue. (Tr. 714, 720, 726, 732, 738.) Dr. Yazji's findings after examining Plaintiff on these separate visits were consistent; he noted effusion and tenderness in her left knee, pain when flexing and extending her left knee, decreased range of motion in both knees, and muscle weakness in both knees. (Tr. 718, 723, 729, 735, 739.) Similarly, Dr. Yazji's treatment plan for Plaintiff was consistent for each visit, including ice, rest, a knee brace, and reduced physical activity. (Tr. 719, 724, 730, 737, 740.) Dr. Yazji also ordered an MRI of Plaintiff's left knee. (Tr. 737.)

---

[11] Plaintiff visited Dr. Yazji's office on June 23, 27, 28, and 29, 2016, as well as on July 19, 2016.

On September 13, 2016, Plaintiff presented for another MRI. (Tr. 853.) The MRI showed "diffuse cartilage loss" in the knee, "attenuated appearance of the medial lateral meniscus," "mild diffuse synovial thickening," "mild knee joint effusion," "mild marrow edema," and "mildly prominent lymph nodes." (*Id.*)

Between August 2016 and March 2017, Plaintiff returned to Dr. Yazji's office complaining of knee pain (*see* Tr. 899, 915, 987, 997, 1010), or for follow-up appointments (*see* Tr. 883, 899, 915, 951, 987, 997). During this time frame, Dr. Yazji again noted pain she had pain in both knees upon flexion and extension, tenderness on palpation, decreased range of motion, instability, effusion, and muscle weakness. (*See* Tr. 883, 902, 918, 919, 951, 990, 1000.) Plaintiff's prescribed treatment plan was largely unchanged during this time as well, including the use of a knee brace, reduced physical activity, rest, physical therapy, and ice. (*See* Tr. 884, 903, 920-21, 960, 986, 991-92, 1002-03.) She was also prescribed pain medication during this time. (Tr. 899-900, 916, 949, 988, 998, 1011.)

From September 2016 through October 2017, Plaintiff continued to visit the office of Dr. Yazji with complaints related to fatigue, obesity, thyroid issues, and a rash,. (*See* Tr. 886, 891, 904, 909, 939, 944-45, 953, 958, 961-67, 984-85, 994, 1004.)

Plaintiff's left knee never quite fully healed, and she ultimately decided to have a total knee replacement, although the exact date of the procedure is unclear. (*See* Tr. 90, 760, 770.)

Plaintiff later submitted additional medical records to the Appeals Council. (Tr. 8-38.) These records included seven visits to the Family Practice Center between February 2018 and November 2018. Plaintiff presented to the clinic complaining of knee osteoarthritis, unsteady gait, hypothyroidism, hip and neck pain, evaluation of her right knee, and right knee pain. (Tr. 8, 12,

12

16, 20, 25, 33.)  The examination of her knees revealed limited range of motion, antalgic gait, edema, tenderness, and crepitus.  (Tr. 10, 13, 21.)

## C.     The Evidentiary Hearing

The ALJ held the evidentiary hearing on June 5, 2018.  (Tr. 80-108.)  Two witnesses testified: Plaintiff and a vocational expert, Eligio Hinojosa.  Plaintiff was assisted at the hearing by a "non-attorney representative."

Plaintiff was 31 years old at the time of the hearing.  (*See* Tr. 82, 256.)  She had an "unsuccessful work attempt" after her alleged onset date due to "missing a lot of work."  (Tr. 85.) Plaintiff discussed her work history, which was largely consistent with her disclosures in her "Work History Report."  (*Compare* Tr. 86-89, *with* 330-336.)  Notably, in working as a receptionist for PlainsCapital Bank in 2014, Plaintiff sat for most of the day and did not lift or carry objects weighing more than 10 pounds.  (Tr. 86.)  Similarly, in working at the call center for Chase Source employment agency, she sat for the majority of the day and did not lift any objects.  (Tr. 86-87.)

In discussing "work activity and the basic functions of work," Plaintiff stated that she is only able to stand, walk, and sit for 10-15 minutes before becoming uncomfortable and/or having to change positions.  (Tr. 89-92.)  When standing too long she gets fatigued and experiences inflammation and swelling in her left knee due to a "recent total knee replacement." (Tr. 90.)  She uses a "single tip" cane to assist her in walking "all the time." (Tr. 90-91.)  Similarly, after sitting for more than 15 minutes, she feels "uncomfortable" in her back and hips.  (Tr. 91.)  Plaintiff noted that she "was on crutches for a year and a half before surgery without being able to get off." (Tr. 91-92.)

Plaintiff testified that she can lift no more than 10 pounds, and if she tried, she would experience swelling in her wrists and hands.  (Tr. 92.)  Due to arthritis, she also has "inflammation

all over [her] joints" that prohibits her right elbow from fully extending, causing a "deformity" in her fingers and "much stiffness in the morning." (*Id.*) Upon questioning by her representative, Plaintiff stated that she is unable to make a fist due to swelling in her fingers and that she can "use" objects in each hand that weigh only five pounds. (Tr. 97.) Plaintiff stated that it is "difficult to shower." (Tr. 92.) Plaintiff's sister assists her with dressing, and other family members help her with caring for her son, cooking, and laundry. (Tr. 93.)

Plaintiff takes "pain medication a lot throughout the day," as well as thyroid medication; her medication inhibits her ability to drive long distances. (Tr. 93.) She is tired, fatigued, and sleeps "so much." (*Id.*) During the hours of 8:00 a.m. and 5:00 p.m., she will "sleep four or five hours." (Tr. 94, 98-99.) When her attorney questioned her, Plaintiff stated that she takes pain medication "at least three times a day" and that this makes her tired and "sometimes" causes dizziness. (Tr. 98.) Plaintiff experiences incontinence as well. (Tr. 94.)

Plaintiff used to "seek a lot of [physical] therapy" for her left knee; however, she stopped about a month before the hearing. (Tr. 94, 96.) After her total left knee replacement, Plaintiff went to therapy on a weekly basis. (Tr. 96.) As to her right knee, Plaintiff claims there is "a deterioration of cartilage" that limits her "mobility to walk." (Tr. 96.) She hopes to start physical therapy on her right knee as soon as her insurance approves it. (*Id.*)

Plaintiff also testified that "changes in temperature and season" will cause her knee to ache and swell up as well as restrict her ability to walk. (Tr. 96.) When she walks too much she has to stop and ice her left knee. (Tr. 96, 99-100.) Plaintiff says she is not supposed to exercise because of the knee replacement; upper body exercise causes her inflammation and aches. (Tr. 97.)

The vocational expert, Mr. Hinojosa, testified that Plaintiff's prior work as a receptionist and customer service representative would be considered at a sedentary exertional level, and her

14

prior work as a grocery clerk would be considered at a light exertional level. (Tr. 101.) The ALJ

asked the following hypothetical:

> [For] the following hypothetical questions please assume a younger individual with more than a high school education and past work the same as [Plaintiff's]. For the first hypothetical assume the individual would be able to perform the physical requirements of work at the sedentary exertional level as defined by the regulations except that the individual would be able to sit without interruption for no more than about 30 minutes followed by an opportunity to stand and stretch briefly one to two minutes without leaving the workstation.  And stand and/or walk without interruption for a combined uninterrupted total of no more than about 15 minutes followed by an opportunity to sit for up to five minutes.  This individual can occasionally balance, stoop, crouch, kneel, crawl, and climb ramps and stairs. Never ladders, ropes or scaffolds.  Assume the individual can only occasionally traverse rough or uneven terrain. Assume the individual could operate foot controls frequently on the right, occasionally on the left.  The individual can reach with the right upper extremity -- let me rephrase, the individual can reach overhead only occasionally bilaterally.  And with the right upper extremity can reach to the front and sides frequently but not continuously.  The individual cannot operate a motor vehicle as an occupational requirement nor work safely around hazards such as unprotected heights or dangerous machinery.  Either the kind with exposed moving parts or the kind that would require alertness and/or agility in order to evade. Assume the individual can tolerate no more than occasional exposure to extreme temperatures, high humidity or wetness, vibration, except that that individual can never utilize vibrating hand tools.  Assume the individual requires reasonable proximity to restroom facilities which I will define as accessible within one to two minutes of normal walking.  And I left out that, too.  Assume the individual can handle and finger and operate hand controls frequently but not continuously bilaterally.  I think I'm going to leave it there for the first hypothetical.  With that combination of limitations would such an individual be able to perform past work?

(Tr. 101-03.)  Mr. Hinojosa responded "[n]o, Your Honor," but that there "[w]ould be other

occupations such an individual could perform.  (Tr. 103.)  Mr. Hinojosa identified the following

three jobs:

1)      Final Assembler: 30,000 jobs available nationally;

2)      Jewelry Preparer: 25,000 jobs available nationally; and

      3)      Compact Assembler: 20,000 jobs available nationally.[12]

(*Id.*)

For the second hypothetical, the ALJ asked Mr. Hinojosa to assume the same hypothetical as the first except the individual could never crouch or crawl and required a handheld assistive device in one hand to rise from a seated position and for ambulation. (Tr. 104.) Mr. Hinojosa stated that "these jobs will still be available." (Tr. 105.) Next, the ALJ imagined an individual with the same limitations as before except that his/her ability to handle, finger and feel would be occasional rather than frequent. (*Id.*) Mr. Hinojosa replied that only one job would be available for this individual; a surveillance system monitor (100,000 jobs available nationally). (*Id.*)

Returning to the second hypothetical, Mr. Hinojosa stated that if the individual could frequently handle, finger, and operate hand controls but required daily opportunity to rest in a reclined or a supine position outside the normal breaks, there would be no jobs that could accommodate such a person. (Tr. 106.) Finally, using the same individual from hypothetical two, an individual would be able to maintain competitive employment even if he/she required a five-minute restroom break every hour, but not if those breaks were twice per hour. (*Id.*)

**D.**    **The ALJ's Decision**

The ALJ issued a thorough written decision, consisting of fifteen pages of single-spaced type. (Tr. 59-73.) In making her decision, the ALJ applied the five-step method for evaluating disability claims.[13]

---

[12] Mr. Hinojosa also noted that even if the individual could never crouch or crawl he/she could still perform these three jobs. (Tr. 103.)

[13] The five-step process for determining whether a plaintiff is eligible for benefits will be explained further in the Standard of Review section of this report, *infra* Part II.A.

The ALJ first found (at Step One) that Plaintiff had not performed substantial gainful activity since the alleged onset date of disability, October 15, 2014. (Tr. 61.) In considering the severity of Plaintiff's impairments (Step Two), the ALJ determined that Plaintiff had the following "severe" medical impairments: "inflammatory arthritis, degenerative joint disease of the left knee with a soft tissue injury, and obesity." (Tr. 62.) The ALJ also determined that Plaintiff had the following "non-severe" impairments: "Hashimoto's thyroiditis, anemia, vitamin deficiencies," and depression. (Tr. 62-63.) In making these determinations, the ALJ summarized the medical evidence of record. (Tr. 65-71.)

The ALJ also found that Plaintiff's impairments were not severe enough, singly or collectively, to meet or medically equal one of the listed impairments in the regulations (Step Three). (Tr. 63-64.) In reaching this conclusion, the ALJ analyzed listings addressing Plaintiff's various physical conditions. (*Id.*) Specifically, the ALJ performed a detailed assessment of "[l]isting 1.02 for dysfunction of a major joint," "listing 14.09 for inflammatory arthritis," and Social Security Ruling 02-1p regarding how obesity may have an "adverse impact on a co-existing impairment." (*Id.*)

The ALJ next assessed Plaintiff's residual functional capacity (RFC) to do physical and mental work activities. The ALJ made the following RFC finding:

> After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1564(a) and 416.967(a) except that she can sit without interruption for no more than 30 minutes, followed by an opportunity to stand and stretch briefly (one to two minutes), without leaving the work station and she can stand and/or walk without interruption for a combined uninterrupted total of no more than about 15 minutes, followed by an opportunity to sit for up to five minutes. She requires the use of a hand-held assistive device in one hand to rise from a seated position and to walk. The claimant can occasionally balance, stoop, kneel, and climb ramps and stairs and never crouch, crawl, or climb ladders, ropes or scaffolds. She can only occasionally traverse rough or uneven terrain. The claimant can operate foot controls frequently on the right and occasionally on the left. The claimant can reach

overhead occasionally, bilaterally, and can reach to the front and sides frequently but not continuously with the right upper extremity. She can handle, finger, and operate hand controls frequently, bilaterally. The claimant cannot operate a motor vehicle as an occupational requirement, nor work safely around extraordinary hazards such as unprotected heights or dangerous machinery (having exposed moving parts or requiring alertness and/or agility in order to evade). She can tolerate no more than occasional exposure to extreme temperatures, high humidity/wetness, or vibration and she can never utilize vibrating hand tools. The claimant requires reasonable proximity to restroom facilities (*i.e.*, accessible within one to two minutes of normal walking).

(Tr. 64.) In making this finding, the ALJ "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." (Tr. 65.)

In considering Plaintiff's symptoms, the ALJ followed the two-step process required by the regulations. First, she considered "whether there is an underlying medically determinable physical or mental impairment(s) … that could reasonably be expected to produce the claimant's pain or other symptoms." (*Id.*) In addressing this inquiry, the ALJ provided a detailed summary of the medical evidence in the record. (Tr. 66-71.) After assessing the evidence regarding Plaintiff's impairments, the second step of the analysis required the ALJ to "evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's work-related activities." (Tr. 65.) In performing this evaluation, the ALJ was required to make a finding on the credibility of Plaintiff's "statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms." (*Id.*)

Ultimately, the ALJ found that Plaintiff suffered from numerous physical impairments; "[h]owever, the objective medical evidence, [Plaintiff's] reported daily activities and testimony, and medical opinions . . . indicate that the intensity, persistence and limiting effects of [her] symptoms are not as restrictive on [Plaintiff's] capabilities, as alleged." (Tr. 71; *see also* Tr. 66.) The ALJ concluded that "while the symptoms do limit [Plaintiff's] functionality, the record,

considered as a whole, supports a finding that [she] has the residual functional capacity to perform sedentary work . . . with the additional limitations outlined [ ] in this decision's residual functional capacity assessment." (Tr. 71.)

The ALJ also considered the medical opinion evidence. (Tr. 69-70.) The ALJ began by evaluating the two opinions of Plaintiff's long-standing treating physician, Dr. Yazji. (Tr. 69.) The ALJ did not afford the March 2012 opinion controlling weight because Dr. Yazji concluded that Plaintiff "was not even capable of sedentary work," even though she was "working at substantial gainful activity levels" at the same time. (*Id.*) The ALJ did afford "substantial weight" to Dr. Yazji's February 2016 opinion that Plaintiff's "mental status and functionality were normal" because it was "consistent with the record as a whole." (Tr. 69-70.)

In addition, the ALJ determined that the psychiatric consultative examiner, Dr. Copp, and the State agency psychiatric consultants' findings were to be given "substantial weight" and "great weight," respectively. (Tr. 70.) The ALJ explained that these opinions found Plaintiff's "mental impairments were non-severe," which was consistent with the medical record and "bolster[ed] the credibility of all three opinions." (*Id.*) Finally, the ALJ gave "some weight" to Plaintiff's GAF scores of 68 and 78, but noted that they "have no 'direct correlation to the severity requirements [of the] mental disorders listings." (*Id.*)

Next, the ALJ found that Plaintiff "is unable to perform any past relevant work" (Step Four). (Tr. 71.) In considering whether Plaintiff could perform any other jobs in the national economy (Step Five), the ALJ relied on the testimony of the vocational expert, Mr. Hinojosa. In particular, Mr. Hinojosa opined that, given the ALJ's RFC finding, Plaintiff could perform several other jobs, including a final assembler, jewelry preparer, and/or compact assembler. (Tr. 72.) From this, the ALJ concluded that Plaintiff is not disabled.

19

### E.     Procedural History

Plaintiff sought administrative review of the ALJ's decision.   The Appeals Council concluded that there was no basis for challenging the decision, rendering it the Commissioner's final decision for purposes of judicial review.  The instant action followed in which Plaintiff seeks review of the decision pursuant to 42 U.S.C. § 405(g).  (Docket No. 1.)  Pending are the parties cross-motions for summary judgment.  (Docket Nos. 7, 10.)  The issues have been briefed by the parties and will be analyzed in light of the applicable standard of review.

## II. ANALYSIS

### A.     Standard of Review

To qualify for benefits under the Social Security Act (the "Act"), Plaintiff bears the burden of proving that she is disabled.  42 U.S.C. § 423(d)(5)(A) ("An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof as the Commissioner of Social Security may require."); *see also Fraga v. Bowen*, 810 F.3d 1296, 1301 (5th Cir. 1987) (citing *Jones v. Heckler*, 702 F.2d 616, 620 (5th Cir. 1983)).  The Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 416(i)(1)(A), 423(d)(1)(A), 1382c(a)(3)(A).  A "physical or mental impairment" is defined as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." *Id.* at §§ 423(d)(3), 1382c(a)(3)(D).

To determine whether a claimant is disabled within the meaning of the Act, the Commissioner applies the following five-step inquiry:

(1)     whether the claimant is currently working in substantial gainful employment;

(2)     whether the claimant suffers from a severe impairment;

(3)     whether the claimant's severe impairment is sufficient under the pertinent regulations to support a finding of disability;

(4)     whether the claimant is capable of returning to his or her past relevant work; and, if not,

(5)     whether the impairment prevents the claimant from performing certain other types of employment.

*See* 20 C.F.R. §§ 404.1520, 416.920.

A finding that a claimant is disabled or not disabled at any point in the five-step inquiry is conclusive and terminates the analysis. *Bowling v. Shalala*, 36 F.3d 431, 435 (5th Cir. 1994). At Steps One through Four, the burden of proof rests upon the claimant to show that she is disabled. If the claimant satisfies this responsibility, the burden then shifts to the Commissioner at Step Five of the process to show that there is other gainful employment that the claimant is capable of performing despite her existing impairments. *Masterson v. Barnhart*, 309 F.3d 267, 272 (5th Cir. 2002). Although the burden is initially on the Commissioner at Step Five, once the Commissioner makes a showing that the claimant can perform other work, the burden shifts back to the claimant to rebut the finding that there are jobs that exist in significant numbers that the claimant could perform. *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005). "Throughout the process, the ultimate burden of establishing disability remains with the claimant." *Strempel v. Astrue*, 299 F. App'x 434, 437 (5th Cir. 2008) (citing *Hames v. Heckler*, 707 F.2d 162, 165 (5th Cir. 1983)).

In this case, the ALJ found at Step Four that Plaintiff was unable to perform her past relevant work. At Step Five, the ALJ found, based on the vocational expert's testimony, that Plaintiff was not disabled because she could perform jobs existing in significant numbers in the

national economy.  In light of this evidence that Plaintiff could perform other work, the ultimate burden of proof remained with the Plaintiff.

A federal court's review of the Commissioner's final decision is limited to determining whether the Commissioner applied the correct legal standards and whether the decision is supported by substantial evidence in the record as a whole.  *Masterson*, 309 F.3d at 272. Substantial evidence is such relevant evidence as a reasonable mind might accept to support a conclusion. *Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001).  It is more than a mere scintilla, but less than a preponderance.  *Id.*  A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings support the decision.  *Id.*  Evidentiary conflicts are for the Commissioner to resolve, not the courts.  *Brown v. Apfel*, 192 F.3d 492, 496 (5th Cir. 1999).  This Court may neither reweigh the evidence in the record, nor substitute its judgment for the Commissioner's, but will carefully scrutinize the record to determine if substantial evidence is present.  *Johnson v. Bowen*, 864 F.2d 340, 343 (5th Cir. 1988).  In applying this deferential standard, however, the Court is not a "rubber stamp" for the Commissioner's decision, particularly given the importance of the benefits in question.  *Cook v. Heckler*, 750 F.2d 391, 393 (5th Cir. 1985); *Alejandro v. Barnhart*, 291 F. Supp. 2d 497, 500 (S.D. Tex. 2003).

**B.     Issues**

In seeking review of the Commissioner's denial of benefits, Plaintiff challenges the ALJ's decision in the following four ways: 1) the ALJ erred at Step Two when she failed to properly consider all of Plaintiff's vocationally significant impairments; 2) the ALJ erred at Step Three when she failed to determine that Plaintiff has a presumptive disability; 3) the ALJ's residual functional capacity (RFC) determination is legally insufficient because she improperly rejected the medical opinions of the State Agency physicians; and 4) the ALJ failed to properly take into

account Plaintiff's subjective complaints about the limiting effects of her symptoms. (Docket No. 7.) The Commissioner argues that he should be granted summary judgment on these issues. (Docket No. 10.)

## C.    Step Two Error

Plaintiff's first claim is that the ALJ erred at Step Two when she failed to properly consider all of Plaintiff's vocationally significant impairments. (Docket No. 7, at 9-11.) Specifically, Plaintiff claims that the ALJ misstated the "the severity standard" and that this error caused her to improperly characterize Plaintiff's thyroid condition as non-severe. (*Id.* at 10.) The Commissioner argues that Plaintiff's claim alleging error at Step Two should be rejected because she has not shown reversible error, and even if she had, any such error would be harmless. (Docket No. 10, at 4-6.)

A severe impairment is "any impairment or combination of impairments which significantly limits [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). The Fifth Circuit has held that an impairment is not severe "only if it is a slight abnormality having such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work." *Stone v. Heckler*, 752 F.2d 1099, 1101, 1104–05 (5th Cir. 1985) (citing *Estran v. Heckler*, 745 F.2d 340, 341 (5th Cir. 1984)). In making a severity determination, the ALJ must set forth the correct standard by reference to Fifth Circuit opinions or by an express statement that the Fifth Circuit's construction of the regulation has been applied. *See Hampton v. Bowen*, 785 F.2d 1308, 1311 (5th Cir. 1986).

Here, the ALJ did not refer to *Stone v. Heckler* in her written decision, nor did she quote the language from the opinion describing what a non-severe impairment is. (*See* Tr. 60, 62.) Rather, she cited to the regulations and Social Security Rulings to describe a non-severe

impairment as follows: "An impairment or combination of impairments is 'not severe' when medical and other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on a individual's ability to work (20 CFR 404.1522 and 416.922; Social Security Rulings (SSRs) 85-28 and 16-3p)."[14]  (Tr. 60.)

Although Plaintiff is correct that this statement of the standard differs "slight[ly]" from that as articulated in *Stone v. Heckler*, the ALJ's written decision shows that she understood the correct legal standard in considering (at Step Two of the disability analysis) whether Plaintiff's thyroid condition was a severe impairment.   Specifically, the ALJ reviewed the medical evidence associated with Plaintiff's Hashimoto's thyroiditis, and noted that "associated symptoms included fatigue and weakness." (Tr. 62, 430, 538, 541, 720, 886, 994.)  However, the medical records also reflected that Plaintiff "was started on Levothyroxine" for her thyroid issues and her "symptoms subsided." (Tr. 62; *see also* Tr. 438, 891, 958.)  During Plaintiff's medical visits, she at times exhibited a normal range of motion in her neck (*see* Tr. 14, 18, 442) and reported that she was feeling better (*see* Tr. 458, 460).  The ALJ noted that Plaintiff had a thyroid nodule that was surgically removed "without complication" and her recovery "was without abnormalities." (Tr. 62.)

As such, the ALJ concluded that "[t]here were no long-term or significant functional limitations associated with" Plaintiff's thyroid issues. (*Id.*)  Plaintiff's thyroid condition "caused no more than a minimal effect on [her] ability to perform basis work activities or perform activities

---

[14] The purpose of SSR 85-28 was to "clarify the policy for determining when a person's impairment(s) may be found 'not severe' and, thus, the basis for a finding of 'not disabled' in the sequential evaluation of disability." SSR 85-28, 1985 WL 56856 (Jan. 1, 1985). In fact, the Social Security Administration also noted that SSR 85-28 was "being issued to clarify that SSA's policy is consistent with various [recent] court decision," such as *Stone v. Heckler*, 752 F.2d 1099 (5th Cir. 1985). *Id.* at *2.

of daily living." (*Id.*)   Consistent with these findings, the ALJ concluded that Plaintiff's Hashimoto's thyroiditis was a "non-severe impairment." (*Id.*)

The ALJ's finding is supported by substantial evidence, as reflected by her detailed written reasons in support of the conclusion that Plaintiff could perform sedentary work. (*Id.*)   Among other things, in summarizing the medical records, the ALJ observed that although Plaintiff had an "enlarged thyroid" in 2017, during other examinations Plaintiff "had a non-tender thyroid," a "supple neck," and she displayed a "normal range of motion of the neck." (Tr. 10, 14, 18, 31, 67, 69, 442.)   Also, the records reflect that Plaintiff's thyroid condition was successfully treated with both medication and surgery. (Tr. 62.)   Furthermore, the ALJ noted that Plaintiff engaged in essentially normal activities of daily living, including maintaining "her own personal care," performing "basic household chores," caring for her son, preparing meals, and shopping by herself. (Tr. 69.)

In any event, even if the ALJ had erred in failing to specifically apply the *Stone* standard, any such error would have been harmless.   The Fifth Circuit does not require "procedural perfection ... unless it affects the substantial rights of a party." *Taylor v. Astrue*, 706 F.3d 600, 603 (5th Cir. 2012).   Here, the ALJ did not end her analysis with a disability finding at Step Two, but rather she considered all of Plaintiff's alleged impairments and symptoms in determining at Step Four that Plaintiff retained the ability to perform a restricted range of sedentary work. (Tr. 64-71.) It is well settled in the Fifth Circuit that reversal is not required if the ALJ does not terminate the case at step two of the sequential analysis. *Taylor v. Astrue*, 706 F.3d 600, 603 (5th Cir. 2012)

("any error by the ALJ in not following the procedures set out in Stone is harmless" when the ALJ

proceeds past step two in the analysis to find that Plaintiff is not disabled).[15]

In sum, even if the ALJ misstated the correct standard at step two of the disability analysis,

there is no merit to Plaintiff's claim that the ALJ should have found her thyroid condition to be

"severe."  Moreover, even if the ALJ had erred on that issue, any such error was harmless because

the ALJ's Step Four analysis is supported by substantial evidence.

## D.    Step Three Error

Next, Plaintiff's claims that the ALJ erred at Step Three when she failed to identify Plaintiff

as having a presumptive disability.  (Docket No. 7, at 11-12.)  Specifically, Plaintiff argues that

the medical evidence shows that she had been "ambulating with the use of two crutches," which

"satisfied the requirements set forth in Section 1.02A for presumptive disability." (*Id.* at 12.) The

Commissioner argues that "there is substantial evidence to support the ALJ's finding that Plaintiff"

did not have a presumptive disability under "the requirements of Listing 1.02A." (Docket No. 10,

at 8.)

"The regulations recognize that certain impairments are so severe that they prevent a person

from pursuing any gainful work." *Heckler v. Campbell*, 461 U.S. 458, 460 (1983).  As the Supreme

Court has explained, the regulatory "listings":

> are descriptions of various physical and mental illnesses and abnormalities, most of
> which are categorized by the body system they affect. Each impairment is defined
> in terms of several specific medical signs, symptoms, or laboratory test results. For

---

[15] *See also Adams v. Bowen,* 833 F.2d 509, 512 (5th Cir. 1987) (finding that appellant's argument that the ALJ erred in failing to find her back problems severe was not grounds for a remand because the case did not implicate the "non-severity" of plaintiff's condition since the ALJ continued through step four of the sequential analysis); *Jones v. Bowen,* 829 F.2d 524, 527 n.1 (5th Cir. 1987) (no *Stone* error where ALJ properly found that the claimant's hypertension was mild and proceeded through step five, rather than denying benefits "prematurely ... based on an improper determination of 'non-severity'"); *Herrera v. Astrue,* 406 F. App'x 899, 903 (5th Cir. Dec. 30, 2010) (same).

a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify.

*Sullivan v. Zebley*, 493 U.S. 521, 529 (1990) (emphasis in original) (footnotes omitted). "The criteria in the medical listings are 'demanding and stringent.'" *Falco v. Shalala*, 27 F.3d 160, 162 (5th Cir. 1994). "For a claimant to show that his impairment matches a listing, it must meet all of the specified medical criteria." *Zebley*, 493 U.S. at 530. "An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Id.*

Regarding plaintiff's impairments, the ALJ discussed Listing 1.02 and analyzed the appropriate factors under that listing. (Tr. 63-64); *see also* 20 C.F.R. Part 404, Subpart P, App. 1, § 1.02. The listing provides as follows:

> 1.02 Major dysfunction of a joint(s) (due to any cause): Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With:
>
> A. Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.OOB2b.

*Bullock v. Astrue*, 277 F. App'x 325, 328 (5th Cir. 2007) (citing 20 C.F.R. pt. 404, Subt. P, app. 1, Listing 1.02). According to the regulation, the "inability to ambulate effectively" can be shown by the following:

> [T]he inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail.

*Bullock*, 277 F. App'x at 328 (citing 20 C.F.R. pt. 404, Subt. P, app. 1, § 1.00(B)(2)(b)).

Here, the ALJ's written decision demonstrates that she evaluated Plaintiff's "degenerative joint disease and soft tissue injury of the left knee" as they related to a "dysfunction of a major joint"; in doing so, the ALJ applied the appropriate Listing (1.02) and considered the proper criteria. (Tr. 63.) In concluding that Plaintiff "does not meet or equal the listing standard of 1.02," the ALJ stated that the "medical records do not indicate a gross anatomical deformity, an inability to ambulate effectively, or an inability to perform fine or gross movements." (Tr. 63-64.)

This conclusion has support in the record. For example, Plaintiff has had two X-rays of her left knee. The X-ray in February 2014 (prior to her alleged disability onset date) revealed only "mild medial compartment narrowing" with "no fracutures subluxations" and "no osteophyte formation[s]." (Tr. 568.) The X-ray in October 2016 showed "no anklyosis," no fractures, no dislocations, some "narrowing of the left knee joint space," but no osteopenia. (Tr. 993.) While Plaintiff's April 2015 MRI reflected several problems with her left knee, it also showed intact ligaments, no fractures, and no anklyosis. (Tr. 480-81.) The MRI in September 2016 showed "diffuse cartilage loss" in the knee and "attenuated appearance of the medial lateral meniscus." (Tr. 853.) However, the other findings were all "mild." Specifically, the MRI showed only "mild diffuse synovial thickening," "mild knee joint effusion," "mild marrow edema," and "mildly prominent lymph nodes." (*Id.*)

Plaintiff suggests that her extended use of two crutches should support a finding that her left knee impairment meets the requirements of Listing 1.02. (Docket No. 7, at 3, 12.) It is true the record reflects that Plaintiff has used crutches to assist her with ambulation. (*See* Tr. 91-92, 427, 442, 565, 696, 845, 982-83.) She has even used a walker on occasion. (*See* Tr. 10, 14.)

However, Plaintiff has not exclusively used two crutches and/or a walker to ambulate. For example, at the evidentiary hearing Plaintiff explained that she uses a "single tip" cane to assist

her in walking "all the time." (Tr. 90-91.)  And while she has used a walker as recently as February and March of 2018, she was given a prescription for a cane on those medical visits.  (*See* Tr. 10, 14.)  This medical evidence supports the ALJ's implicit finding that Plaintiff was not unable to walk without "a walker, two crutches or two canes," as the regulation requires.  The ALJ was not bound by Plaintiff's decision to use a walker even though it was not prescribed by a doctor.  Furthermore, during a medical visit in October 2018, the doctor observed that Plaintiff is ambulatory, "walks without restrictions," and "[a]t the present time . . . does not use an assistive walking device." (Tr. 21.)

For these reasons, the ALJ's finding that Plaintiff did not meet the requirements in Listings 1.02 is supported by substantial evidence in the record.  As such, Plaintiff's claim that the ALJ erred at Step Three of the disability analysis should be denied.

**E.      The ALJ's Consideration of the Medical Opinion Evidence**

Next, Plaintiff's alleges that the ALJ's residual functional capacity (RFC) determination is legally insufficient because she rejected the medical opinions of Dr. Yazji and the State Agency physicians and improperly substituted her own lay medical judgment.  (Docket No. 7, at 13.)  The Commissioner contends that the ALJ properly considered the medical opinion evidence in the record and thus did not commit any reversible error in her RFC determination.  (Docket No. 10, at 9-12.)  The ALJ's consideration of each of the medical experts' opinions will be addressed, although Plaintiff's argument focuses on the state agency doctors.

1.      Dr. Yazji's Opinion

On March 31, 2012—two years before Plaintiff claims to have become disabled—Dr. Yazji completed an RFC assessment form.  (Tr. 425-29.)  Dr. Yazji found that Plaintiff had severe functional limitations that precluded her from doing even sedentary or light work.  (Tr. 425-27.)

Because there are no medical records in the administrative record dating prior to March 31, 2012, it is unclear if there are medical findings and testing to support Dr. Yazji's 2012 RFC assessment.

Despite the absence of supporting medical evidence, the ALJ was required to consider Dr. Yazji's opinion about Plaintiff's work-related physical limitations. 20 C.F.R. § 404.1527(b); *see also Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000).[16]   A medical opinion from a treating doctor will be accorded "controlling weight" where it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record.  20 C.F.R. § 404.1527(c)(2).  The ALJ must "give good reasons" for the weight given to treating doctors' opinions.  *Id.*

In applying these regulatory requirements, the Fifth Circuit has "long held that 'ordinarily the opinions, diagnoses, and medical evidence of a treating physician who is familiar with the claimant's injuries, treatments, and responses should be accorded considerable weight in determining disability.'"  *Greenspan v. Shalala*, 38 F.3d 232, 237 (5th Cir. 1994) (quoting *Scott v. Heckler,* 770 F.2d 482, 485 (5th Cir.1985)); *see also Newton*, 209 F.3d at 455 (noting that the opinions of treating doctors are generally to be accorded "great weight").  "The treating physician's opinions, however, are far from conclusive."  *Greenspan,* 38 F.3d at 237.  Ultimately, "the ALJ has sole responsibility for determining a claimant's disability status," and "the ALJ is free to reject the opinion of *any* physician when the evidence supports a contrary conclusion."  *Newton,* 209

---

[16] Under the regulations, medical opinions are defined as follows:

Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions.

20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2).

F.3d at 455 (quoting *Paul v. Shalala*, 29 F.3d 208, 211 (5th Cir. 1994)) (emphasis added). Even the opinions of treating physicians "may be assigned little or no weight when good cause is shown." *Newton*, 209 F.3d at 455–56. Good cause exists when a treating source's opinion is conclusory, unsupported by medically acceptable evidence, or is otherwise lacking substantial support. *Id.* at 456. "[T]he ALJ 'is entitled to determine the credibility of medical experts as well as lay witnesses and weigh their opinions accordingly.'" *Greenspan*, 38 F.3d at 237 (quoting *Scott*, 770 F.2d at 485).

Here, the ALJ gave Dr. Yazji's 2012 RFC assessment "minimal weight" for two reasons. (Tr. 69.) First, the record showed that during the same time Dr. Yazji determined that Plaintiff was incapable of performing work at the sedentary level, she was actually employed in substantial gainful activity. (*Id.*; *see also* Tr. 283.) Plaintiff's ability to sustain substantial gainful activity during this time period shows that she was not disabled. *Price v. Richardson*, 443 F.2d 347, 347-48 (5th Cir. 1971) ("[A]lthough bearing the burden of a terminal illness, the claimant was engaged in substantial gainful activity and hence was not disabled under the law."); *White v. Heckler*, 740 F.2d 390, 395 (5th Cir. 1984) ("disability benefits should be terminated because [the claimant] had regained the ability to engage in substantial gainful activity").

Second, the ALJ found that Dr. Yazji's RFC assessment was of "little probative value" because his assessment was over two years before Plaintiff alleged that she was unable to work due to a disability. (*See* Tr. 69, 256, 429.) This was not error. The ALJ properly considered the opinion, even though it predated the alleged onset date. *See* 20 C.F.R. § 404.1527(c) ("Regardless of its source, we will evaluate every medical opinion we receive."); *see also Carpenter v. Astrue*, 537 F.3d 1264, 1266 (10th Cir. 2008) (the ALJ is required to consider medical evidence in the record prior to the alleged onset date); *Burks-Marshall v. Shalala*, 7 F.3d 1346, 1348 n.6 (8th Cir.

31

1993) ("Evidence from the record of a prior claim may be relevant to a claim of disability with a later onset date."); *Halvorsen v. Heckler*, 743 F.2d 1221, 1225-26 (7th Cir. 1984) (finding "no doubt that medical evidence from a time subsequent to a certain period is relevant to a determination of a claimant's condition during that period"). After considering Dr. Yazji's opinion, it was then the ALJ's role to determine what weight to give it. *Newton*, 209 F.3d at 455–56. The ALJ had good cause to give the opinion minimal weight since it was unsupported by any contemporaneous medical evidence and inconsistent with Plaintiff's work activity at the time. *See id.* at 456.

In short, the ALJ considered Dr. Yazji's medical opinion, and the decision to accord it "minimal weight" is supported by good cause. As such, Plaintiff's claim that the ALJ committed reversible error by improperly considering Dr. Yazji's opinion should be rejected.

2.    Underline State Agency Medical Consultants

On March 8, 2016, Dr. Michal Douglas, a state agency physician, reviewed Plaintiff's medical records and performed an RFC assessment. (Tr. 116-17, 119-22.) Dr. Douglas's findings reflected that Plaintiff had the functional capacity to perform light work with some restrictions in climbing stairs and kneeling and crouching. Dr. Douglas concluded that Plaintiff's alleged subjective limitations were only partially supported by objective medical evidence. (Tr. 122.) Dr. Brian Harper, another state agency physician, later reviewed Plaintiff's medical records and agreed with Dr. Douglas. (Tr. 150, 153-54, 155-56.)

The regulations explain that the state agency consultants "are highly qualified" physicians and psychologists "who are also experts in Social Security disability evaluation." 20 C.F.R. §§ 404.1527(f)(2)(i), 416.927(f)(2)(i). As such, the ALJ "must consider findings of State agency

medical and psychological consultants . . . as opinion evidence," except on the ultimate issue of disability. *Id.*

Before discussing the ALJ's consideration of the state agency medical doctors' opinions, it should be noted that Plaintiff's argument is curious. Plaintiff seems to fault the ALJ for not simply adopting the state agency doctors' findings. But the ALJ's RFC finding was *more favorable* to Plaintiff than the findings of the state medical consultants. Had the ALJ simply accepted their findings wholesale, Plaintiff argument would fail, and she would have likely been found not disabled at Step Four (or, if not, there would have been many more types of available work at Step Five).

In any event, the ALJ's decision reflects that she properly considered the state agency doctors' medical opinions. As noted, their findings reflected Plaintiff "was capable of light work"[17] with restrictions, while the ALJ determined that Plaintiff was capable of sedentary work[18]

---

[17] Under the regulations "light work" is defined as follows:

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 416.967

[18] Under the regulations "sedentary work" is defined as follows:

> Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

with certain restrictions. The ALJ explained that she gave the state agency doctors' RFC findings "little weight" because they were "inconsistent with the medical evidence." (Tr. 70.) The ALJ described the relevant medical findings and cited to evidence in the record supporting her conclusion. (*Id.*)

But the ALJ did not completely reject the opinions of the state agency doctors. Although the ALJ's RFC in general is more detailed and restrictive than theirs, the two RFCs are consistent in several ways. For example, both RFCs found that Plaintiff could only occasionally kneel and climb. (*Compare* Tr. 64 (occasionally kneel and climb ramps), *with* Tr. 120 (occasionally climb and kneel).) Also, both of the RFCs determined that Plaintiff's abilities were limited by her lower left extremities. (*Compare* Tr. 64 (she can operate foots controls occasionally on the left), *with* Tr. 120 (limited in lower left extremities).) In addition, both the ALJ and the state agency doctors found that Plaintiff was limited in her ability to manipulate objects with her fingers. (*Compare* Tr. 64 (never utilize vibrating hand tools), *with* Tr. 121 (limited in fine finger manipulation).)

Federal courts have rejected the notion that an ALJ commits reversible error merely by including more restrictions in her RFC assessment than the state agency doctors. *See Martin v. Colvin*, 14-cv-3119, 2015 WL 2114506, at *5 (N.D. Tex. May 5, 2015) (the court found no error where the ALJ found that Plaintiff could perform less strenuous work than the medical consultants had determined); *Asher v. Colvin*, 12-cv-831, 2014 WL 888350, at *12 (N.D. Tex. Mar. 6, 2014) (the ALJ stated that he did not afford the agency consultants' opinions great weight because he found that the claimant was more restricted than found by them); *Lott v. Astrue*, No. 08-cv-1234, 2010 WL 26472, at *5 (N.D. Tex. Jan. 4, 2010) (same). Stated another way, "[i]f anything, the ALJ's discounting of the state agency opinions benefitted [Plaintiff's] case and, therefore, does

---

20 C.F.R. § 416.967

not constitute error." *Riley v. Berryhill*, No. 16-cv-776, 2017 WL 3468556, at *3 (W.D. Ky. Aug. 10, 2017).

Beyond that, there is substantial medical evidence to support the ALJ's decision to not fully credit the state agency doctors' opinions and to find that Plaintiff's RFC was somewhat more restrictive. *See Williams v. Colvin*, F. App'x 350, 354 (5th Cir. 2014) (affirming summary judgment in favor of the Commissioner where "there is substantial evidence in the record to justify the ALJ's decision to give less weight" to a doctor's opinion). For example, as to Plaintiff's lower extremities, the medical evidence shows (among other things) that she exhibited swelling, tenderness, weakness, and a decrease in her mobility and range of motion. (*See* Tr. 430-44, 463-64, 640-50, 666-83, 714, 718, 723-24, 729, 735, 808-17, 837-48, 867-70, 882-85, 922-38.) Such evidence supports the ALJ's decision.

Here again, the ALJ is "entitled to determine the credibility of medical experts as well as lay witnesses and weigh their opinions accordingly." *Greenspan*, 38 F.3d at 237; *see also Williams v. Colvin*, 575 F. App'x 350, 355 (5th Cir. 2014) (finding substantial evidence to justify the ALJ's decision to accord treating doctor's opinion less weight where, among other things, he appeared "to unduly rely upon [the claimant's] subjective history"). Because the ALJ had good cause to give less than full weight to the state agency doctors' opinions, Plaintiff's argument lacks merit.

## F.    Subjective Complaints

Finally, Plaintiff argues that the ALJ erred when she failed to properly consider Plaintiff's subjective complaints of the limiting effects of her symptoms. (Docket No. 7, at 16-17.) Specifically, Plaintiff argues that the ALJ's "improper credibility evaluation [likely] impacted her determination of [the] residual functional capacity." (*Id.* at 17.) The Commissioner contends that

"there is nothing in the record to suggest that the ALJ made improper credibility findings." (Docket No. 10, at 12-14.)

An ALJ performs a two-step analysis in considering a claimant's subjective complaints. First, the ALJ determines whether the claimant has a "medically determinable impairment that could reasonably be expected to produce [her] symptoms." 20 C.F.R. § 416.929(b); *see also Chambliss*, 269 F.3d at 522 (stating that "[s]ubjective complaints of pain must also be corroborated by objective medical evidence"). Second, the ALJ then must evaluate "the intensity and persistence of [her] symptoms," to determine the extent to which they limit the claimant's capacity for work. 20 C.F.R. § 416.929(c). This determination is made by considering the "objective medical evidence" and other evidence. *Id.* at § 416.929(c)(2) & (c)(3). The regulations also list factors to be considered in making this determination.[19] *Id.*

The ALJ's written decision reflects that she articulated the correct legal standard in considering Plaintiff's subjective complaints. (Tr. 7-8.) The records shows that there is substantial evidence in support of her assessment of those complaints.

The medical record is replete with Plaintiff's complaints of pain to her left knee (in particular.) To be sure, "pain alone can be disabling." *See Cook v. Heckler*, 750 F.2d 391, 395 (5th Cir. 1985). "Pain may constitute a non-exertional impairment that can limit the jobs a claimant would otherwise be able to perform." *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir.

---

[19] These factors include: (1) the individual's daily activities; (2) the location, duration, frequency, and intensity of the pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms; and (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 416.929(c)(3). Any determination of credibility must be "grounded in the evidence and articulated in the determination or decision." *Id.*

1990) (citing *Carter v. Heckler*, 712 F.2d 137, 141–42 (5th Cir. 1983)). However, "[t]he mere existence of pain is not an automatic ground for obtaining disability benefits." *Nugent v. Astrue*, 278 F. App'x 423, 427 (5th Cir. 2008) (citing *Cook*, 750 F.2d at 395). To be disabling, "pain must be constant, unremitting, and *wholly unresponsive* to therapeutic treatment." *Chambliss v. Massanari*, 269 F.3d 520, 522 (5th Cir. 2001) (citing *Falco v. Shalala*, 27 F.3d 160, 163 (5th Cir. 1994)) (emphasis added).

The Fifth Circuit has explained the ALJ's important role in addressing a claimant's complaints of pain:

> Whether pain is disabling is an issue for the ALJ, who has the primary responsibility for resolving conflicts in the evidence. *See Carrier v. Sullivan*, 944 F.2d 243, 247 (5th Cir. 1991). It is within the ALJ's discretion to determine the disabling nature of a claimant's pain, and the ALJ's determination is entitled to considerable deference. *See Wren v. Sullivan*, 925 F.2d 123, 128 (5th Cir. 1991); *James v. Bowen*, 793 F.2d 702, 706 (5th Cir. 1986). The determination whether an applicant is able to work despite some pain is within the province of the administrative agency and should be upheld if supported by substantial evidence. *See Jones v. Heckler*, 702 F.2d 616, 622 (5th Cir. 1983).

*Chambliss*, 269 F.3d at 522.

The ALJ found that Plaintiff had the residual functional capacity to perform sedentary work with certain restrictions, including (among other things) the need to use a "hand-held assistive device in one hand to rise from a seated position and to walk." (Tr. 64.) Based on the vocational expert's testimony, this RFC does not preclude Plaintiff from performing certain sedentary jobs that are available in the national economy.

The ALJ's written decision recited that "[a]fter careful consideration of the evidence, I find that the claimant's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limited effects of these symptoms are not entirely consistent with the medical

evidence of record." (Tr. 66.) The ALJ's analysis on this issue was not cursory. Far from it, her written decision devotes about six pages of single-spaced text in addressing the medical evidence relating to Plaintiff's subjective symptoms. (Tr. 66-71.) The ALJ describes in significant detail Plaintiff's hearing testimony about her alleged limitations. (Tr. 65-66.) Most of the relevant medical evidence related to Plaintiff's left knee pain, but the ALJ also discussed the evidence relating to her thyroid, right knee, back, and wrists and hands. (Tr. 66-71.)

The ALJ stated that she had "read the entirety of the evidence on record and considered everything in determining the claimant's residual functional capacity." (Tr. 66.) She concluded:

> Here, the claimant has described daily activities and exhibited behavior that is inconsistent with the claimant's allegations of disabling symptoms and limitations. Additionally, the objective medical records do not completely corroborate her statements and allegations regarding her impairments and resultant limitations.
> ....
> [T]he objective medical evidence, the claimant's reported daily activities and testimony, and medical opinions [ ], indicate that the intensity, persistence and limiting effects of these symptoms are not as restrictive on the claimant's capabilities, as alleged.

(Tr. 66, 70-71.) Stated another way, the ALJ found that Plaintiff's subjective complaints about the limiting effects of her various impairments were not fully credible.

The ALJ's credibility finding is entitled to "considerable deference," particularly since the ALJ had the opportunity to observe Plaintiff's testimony at the hearing. *Falco v. Shalala*, 27 F.3d 160, 164 & n.18 (5th Cir. 1994) (noting that an ALJ's findings regarding a claimant's subjective complaints of pain "are precisely the kinds of determinations that the ALJ is best positioned to make," particularly since the ALJ "enjoys the benefit of perceiving firsthand the claimant at the hearing"); *Wren v. Sullivan*, 925 F.2d 123, 128 (5th Cir. 1991) (stating that "it is within [the ALJ's] discretion to determine the pain's disabling nature" and "[s]uch determinations are entitled to

considerable deference"); *see also Newton*, 209 F.3d at 459 (noting that "an ALJ's assessment of a claimant's credibility is accorded great deference" where it is supported by substantial evidence).

The ALJ did not ignore Plaintiff's subjective complaints. Indeed, she found that her RFC was quite limited, permitting her to do only sedentary work with several additional restrictions. The ALJ's inclusion of a restriction allowing for the use of a cane, frequent breaks allowing Plaintiff to change positions, and close proximity to a restroom also show that she took Plaintiff's subjective complaints into account.

Based on the record here, Plaintiff has fallen far short of showing that the ALJ abused her discretion in determining that Plaintiff's subjective complaints are not fully credible.

## III.  CONCLUSION

For the foregoing reasons, the undersigned recommends that Plaintiff's Motion for Summary Judgment (Docket No. 7) be DENIED, that Defendant's Motion for Summary Judgment (Docket No. 10) be GRANTED, that the Commissioner's decision be AFFIRMED, and that this action be DISMISSED.

Due to the detailed medical information summarized in this report, it is **ORDERED** that the Clerk shall file this Report and Recommendation under **SEAL**.

## NOTICE TO THE PARTIES

The Clerk shall send copies of this Report and Recommendation to the parties who have fourteen (14) days after receipt thereof to file written objections pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72(b) of the Federal Rules of Civil Procedure. Failure to file timely written objections shall bar an aggrieved party from receiving a de novo review by the District Court on an issue covered in this Report and, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the District Court.

DONE at McAllen, Texas on September 11, 2020.

Peter E. Ormsby
UNITED STATES MAGISTRATE JUDGE